## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| Herbert Ross, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-11392-DJC |
| | ) | |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
|_____ | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                       May 26, 2011

### I.    Introduction

Plaintiff Herbert Ross ("Ross") filed claims for disability insurance benefits ("SSDI") and

supplemental security income ("SSI") with the Social Security Administration.  Pursuant to the

procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Ross brought this

action for judicial review of the final decision of  Defendant Michael J. Astrue, Commissioner of

the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge

("ALJ") on March 24, 2009, denying his claim.  Before the Court are Ross's Motion to Reverse or

Remand and the Commissioner's Motion to Affirm that decision.  In his motion, Ross claims that

the ALJ erred in denying his claim because:  i) there was no substantial evidence to support his

finding that Ross retained a residual functional capacity to perform a full range of work at all

exertional levels and that he was not significantly compromised by nonexertional limitations since

there were medical opinions indicating that he had functional limitations; ii) the ALJ failed to

evaluate properly Ross's subjective complaints regarding his functional limitations; and iii) the ALJ failed to elicit testimony from the vocational expert regarding the impact of those functional limitations or the relevant vocational factors. Because it is not clear what consideration the ALJ gave to the medical opinions of physicians, including his treating psychiatrist, regarding Ross's functional limitations and because the ALJ failed to apply all of the <u>Avery</u> factors in considering Ross's testimony and his questions to the vocational expert did not take Ross's functional limitations into account or address appropriate vocational factors, the Commissioner's final decision is remanded to the ALJ as directed below.

## II.    Factual Background

Ross was 52 years old when he ceased working on November 9, 2006. R. 91.[1]  He had previously worked as a laundry attendant at the YMCA. R. 18, 105.  In his June 21, 2007 application for SSDI and SSI with the Social Security Administration ("SSA"), he alleged disability due to depression, kidney cancer (pending test results), prostate cancer, pain and fatigue. R. 104, 105, 111.

## III.    Procedural Background

Ross filed claims for SSDI and SSI with the SSA on June 21, 2007, asserting that he was unable to work as of November 9, 2006. R. 81-90, 91-97.  After initial review, his claims were denied on September 7, 2007. R. 47, 50. His claims were reviewed by a Federal Reviewing Official and again denied on July 15, 2008. R. 38-46. On August 29, 2008, Ross filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 57.  A hearing was held before an ALJ on January 7, 2009. R. 14.  In a written decision dated March 24, 2009, the ALJ found that Ross

---

[1]Citations to the administrative record in this case, Docket No. 11, shall be to "R. —."

had the residual functioning capacity to perform a full range of work at all exertional levels and that

he is able to perform past relevant work.  R.  11-12.  The ALJ thus determined that, from November

9, 2006 until the ALJ decision was issued on March 24, 2009, Ross did not have a disability within

the definition of the Social Security Act and denied Ross's claims.  R. 12-13.  Although the ALJ

notified Ross that the SSA's Decision Review Board ("the Board") selected his claim for review,

R. 4, the Board did not complete its review of Ross's claim during the requisite time period.  R. 1.

Accordingly, the ALJ's decision is the Commissioner's final decision.  R.  1.

## IV.    Discussion

### A.  Legal Standards

#### 1.  Entitlement to Disability Benefits and Supplemental Security Income

A claimant's entitlement to SSDI and SSI turns in part on whether he has a "disability,"

defined in the Social Security context as an "inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. §§ 416(i), 423(d)(1)(a); 20 C.F.R. § 404.1505.  The inability must be severe,

rendering the claimant unable to do his or her previous work or any other substantial gainful activity

which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process when he determines whether an

individual has a disability for Social Security purposes and, thus, whether that individual's

application for benefits will be granted.  20 C.F.R. § 416.920.  All five steps are not applied to every

applicant; the determination may be concluded at any step along the process.  Id.  First, if the

applicant is engaged in substantial gainful work activity, then the application is denied.  Id.  Second,

if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.

## 2. Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro, 76 F.3d at 16, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

4

### B. Before the ALJ

#### 1. Medical History

There was extensive evidence about Ross's medical history, including diagnoses and treatment, before the ALJ, particularly in regard to the conditions upon which Ross relied in claiming a disability in his application for SSDI and SSI benefits.

#### a. Depression

In January 2007, Ross was diagnosed with major depressive disorder, recurrent, mild. R. 435-40. At that time, nurse Robert Russell gave Ross a Global Assessment of Functioning ("GAF") of 60.[2] R. 435. Ross was taking Doxepin for his anxiety and depression. R. 437-38. Nurse Russell reported that Ross had no symptoms of anxiety attacks, concentration difficulties, nervousness, daily functioning difficulties or fatigue. R. 438. However, one month later, Ross was hospitalized in February 2007 with a diagnosis of major depressive disorder and "substance-induced mood disorder" (related to admitted cocaine abuse). R. 159-61, 424. Although Ross denied an urge or plan to harm himself, "the severity of his depressive [symptoms] in [the] context of life stresses and "his sister's fear" for his safety were "concerning." R. 423. During his hospitalization, Ross admitted that crack cocaine abuse had contributed to his deteriorating of functioning and admitted that he did not take his Doxepin while using crack cocaine. R. 249-50, 253. Ross also indicated that he lost his job as a laundry attendant because of problems with absenteeism which he attributed to

---

[2]The GAF scale is used to report a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text rev. 2000) ("DSM IV"). GAF scores in the 51–60 range indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV 34.

his addiction.  R. 253.

Following his hospitalization and throughout 2007, Ross continued treatment with his treating psychiatrist, Dr. Eugene Uzogara, who reiterated the earlier diagnosis of major depressive disorder, recurrent, mild and a GAF assessment of 60.  R. 341, 345, 349, 428, 432.   In July 2007, Dr. Uzogara completed an Emergency Aid to the Elderly Disabled and Children ("EAEDC") Medical Report for the Massachusetts Department of Transitional Assistance ("DTA Medical Report") in which he indicated that Ross had a disability under the DTA's standards that would be expected to last 6-12 months.  R. 376.  Dr. Uzogara noted that Ross had chronic relapsing depression and suffered from anxiety, had limited memory for recent information, decreased concentration ability and limited ability to interact with co-workers and supervisors.  R. 377, 380.

In connection with Ross's application for SSDI and SSI benefits, in September 2007, Dr. Jane Metcalf reviewed his medical record and completed a Psychiatric Review Technique in which she determined that Ross's impairment was not severe.  R. 202-14.  She noted that Ross had mild restrictions of activities of daily living and mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  R. 212.  Dr. Metcalf further indicated that Ross had difficulty concentrating and thinking, decreased energy, R. 205, and that he had complained of pain. R. 214.

In September 2007, Dr. Uzogara observed that Ross was stable on medication and that constipation was the only side effect of the medication.  R. 341.  In October 2007, Ross underwent an examination by Dr. Scott Haas who diagnosed Ross with depressive disorder and determined that his GAF was 60.  R. 446.  During this examination,  Dr. Haas observed that Ross was preoccupied, sad and concrete, but that his memory was adequate for immediate recent and remote events with

some compromise secondary to concreteness. R. 443. He also noted that Ross's attention and concentration were adequate. R. 443.

Following that examination, and after his application to EAEDC, on October 31, 2007, the University of Massachusetts Disability Evaluation Services ("DES") informed Ross of its finding that he had a disability expected to last through January 31, 2008. R. 363. In the report appended to the DES's decision, Dr. Eduard Aberger indicated that Ross had depression, that he had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner in work settings or elsewhere and that he was moderately limited in understanding, remembering and carrying out detailed instructions and in his ability to work at a consistent pace. R. 372-74.

Dr. Aberger also found that Ross was "[n]ot [l]imited" in most other areas including, *inter alia,* the ability to "[u]nderstand, remember & carry out very short and simple instructions," "[m]aintain attention & concentration to sustain employment" and "[i]nteract and cooperate appropriately with co-workers." R. 373. The report further indicated that Ross "is capable of performing basic, unskilled work activity" and that Ross's memory, attention and concentration were all adequate. R. 367.

By letter dated June 5, 2008, DES informed Ross that they found he continued to be disabled through December 5, 2008. R. 291. During the evaluation process, Ross was examined by Dr. Jasper Lawson on April 9, 2008 and by Dr. Madhusudan Thakur on May 21, 2008. R. 317-23. In his report, Dr. Lawson noted, *inter alia,* that Ross had low average cognitive ability and major depression coupled with alcohol abuse and concluded that Ross's GAF was 50. R. 322-23. Before Ross was examined by Dr. Thakur or Dr. Lawson, Dr. Uzogara completed a DES evaluation form

and on January 16, 2008, reported that Ross had a limited ability to concentrate, persist, understand, remember and interact with co-workers and supervisors. R. 314. Throughout 2008, Ross continued to report to Dr. Uzogara and Karen Fink LICSW for psychotherapeutic treatment, (R. 448-488), and Ross's GAF was consistently reported as 60. R. 330, 333-43, 337, 449-51, 454, 458-59, 461-62, 465-66, 469-70, 473-74, 477, 480. In November 2008, Dr. Uzogara noted that Ross was experiencing no side effects from his medication. R. 453.

### b. Kidney Cancer

Ross has a small lesion on his kidney that has yet to be diagnosed as cancerous. In February 2007, Ross presented to Beth Israel Hospital with complaints of epigastric pain and physicians found a lesion at the inferior pole of his left kidney. R. 161-62. Dr. Jacques Carter ordered an MRI to further assess the lesion but the results were inconclusive. R. 153. Dr. Carter subsequently ordered a CT scan, the results of which suggested the presence of renal neoplasm. R. 152-53. Because the CT scan was inconclusive, Dr. Carter recommended that Ross follow up with urologist Dr. Martin Sanda. R. 151. Dr. Sanda indicated that because the kidney lesion was small, immediate intervention was unnecessary, but if the mass enlarged, Dr. Carter could consider a more aggressive approach to treatment. R. 150. Ross continued to follow up with Dr. Carter regarding this lesion, but took no further steps regarding treatment. R. 261.

### c. Prostate Cancer

In addition to the lesion on his kidney, Ross underwent a radical prostatectomy in 2005 for prostate cancer. R. 186-96, 261. Since that surgery, his prostate-specific antigens became "undetectable." R. 261. In July 2007, Dr. Sanda noted that Ross was continent and had recovered firm erections. R. 150. In July 2008, Ross recovered erectile abilities. R. 261. Neither the record

nor Ross's testimony provided any indication that his prostate cancer had resurfaced.

### d. Physical Pain

Throughout his behavioral health treatment in 2007 and once in July 2008, Ross reported to physicians that he had no physical pain. R. 428, 432, 438, 464. In July 2007, Dr. Uzogara did not explicitly state in her DTA Medical Report that Ross had any physical limitations. R. 376-80. When Dr. Haas examined Ross in October 2007, Ross reported that he took walks, watched TV and played music all on a regular basis, that he shopped for groceries, cooked and attended church occasionally. R. 445. As to household chores, Ross indicated that he made his bed and washed dishes. R. 445. Ross also reported some pain in the "mobility" area of daily living. R. 445. Dr. Aberger noted in his report that Ross had the "ability to travel outside the home" and was "capable of performing basic, unskilled work activity." R. 367, 373.

Dr. Uzogara's January 16, 2008 DES report indicated that Ross had no restrictions on his ability to stand, sit and walk, but had a limited ability to stoop, bend and carry up to ten pounds. R. 315. Dr. Thakur's May 2008 report noted that Ross indicated his symptoms to include, *inter alia,* dizziness upon standing, bending or lifting, chronic depression, chest pain while lying down and heartburn. R. 317, 319.

During his behavioral health treatment in 2008, Ross complained of intermittent pain in his knees in 2008, (R. 449, 453, 457, 468), but indicated that he experienced no other physical pain. R. 449, 453, 457, 468. On July 2, 2008, in a physical examination, Dr. Carter observed that Ross appeared well, that he was in no acute distress and that Ross was in "good tone, mass and strength in the muscles of the upper and lower extremities." R. 262. In his July 28, 2008 behavioral assessment evaluation, Ross reported that he experienced no pain. R. 473, 476-77. However, in a

subsequent behavioral health assessment, Ross reported that he spends most of his time in bed because it is the most comfortable place for him due to his pain and that "his bad knees prevent him from doing the housecleaning/janitorial work [w]hich he used to do." R. 469.

### 3. ALJ Hearing

At the January 7, 2009 administrative hearing, the ALJ heard testimony from two witnesses, Ross and a vocational expert ("VE"). Ross testified that he had last worked as a laundry attendant in November 2006 but that he was fired due to lack of attendance, that he had to take days off due to pain and dizziness and that he did not lose his job due to cocaine use. R. 18, 25, 26. He stated that he had tried working as a home care aid immediately after losing his job but quit due to the pains in his stomach. R. 18. Ross further testified that he was unable to obtain employment because he was "not as educated" and had "a lot of trouble standing, bending, lifting" and with anxiety attacks. R. 19. He explained that he could stand and sit for maybe one or two hours each day, that he could carry 20 pounds and that he leaves his home only once a month to shop for groceries. R. 19-20. With respect to his depression, Ross testified that he experiences anxiety attacks when he is around people, that he becomes nervous and that he was hospitalized because he was "feeling suicidal." R. 23. He claimed his Doxepin made him drowsy, dizzy and constipated. R. 24.

The vocational expert testified that if the ALJ accepted Ross's allegations as true, particularly with respect to the limitations in his ability to complete a workday without side effects from medication or chronic pain, he would be unable to perform any work. R. 29. In the absence of such limitations, however, the vocational expert testified that Ross would be able to return to his past relevant work as a laundry attendant. R. 30.

10

## 4.    Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Ross was not engaged in substantial gainful work activity. R. 9 at ¶ 2. At step two, the ALJ found that Ross had severe impairments, namely prostate cancer, hepatitis C and mild depression. R. 9 at ¶ 3. At step three, the ALJ found that Ross had mild restrictions in daily living activities and social functioning and "moderate difficulties" in maintaining concentration, persistence or pace, with no episodes of decompensation, and thus, determined that Ross's impairments did not meet the conditions set forth in the Social Security regulations that lead to an automatic grant of disability benefits. R. 10 at ¶ 4. Ross does not challenge the Commissioner's findings at steps one through three.

Ross does dispute the Commissioner's RFC determination and its application of this determination at steps four and five. At step four, the ALJ determined that Ross' statements concerning "the intensity, persistence and limiting effects" of his alleged symptoms, namely having anxiety attacks, having difficulty bending, being limited to walking "for only ½ mile," "stand[ing] for 1-2 hours," "sit[ting] for 1-2 hours," "lift[ing] up to 20 pounds" and experiencing "fatigue and dizziness," were not credible. R. 11, 19. With respect to Ross's alleged depressive symptoms including, *inter alia,* "anxiety attacks when [he is] around people, nervous" (R. 23), the ALJ determined that the record did not support the symptoms Ross alleged, noting that the record shows his depression was "just mild in severity" and that "his global assessment of functioning was found to be consistently 60 over a prolonged period of time. . . ." R. 11-12. As to Ross's physical impairments, the ALJ found that he did not have any limitations from any of his impairments and that the record established that he did not have any "restrictions on his abilities to stand and walk

11

and he did not have any limitations on his ability to sit." R. 12. Thus, the ALJ concluded that Ross has the "residual functional capacity to perform a full range of work at all exertional levels and his ability to perform work at all exertional levels is not significantly compromised by any nonexertional limitations." R. 11.

Based on this determination of Ross's RFC, the ALJ found that Ross is able to perform his past relevant work as a laundry attendant. R. 12. Consequently, the ALJ concluded that Ross was not disabled within the regulatory framework of the Social Security Act. R. 12.[3]

## C.    Ross's Challenges to the ALJ's Findings

Ross contends that the ALJ erred by (1) finding that Ross was capable of the full extent of all exertional work despite medical opinions that Ross has functional limitations and the ALJ's own finding of moderate limitations in maintaining concentration, persistence or pace; (2) finding that Ross lacked credibility in his subjective complaints about his limitations which he argues is unsupported by substantial evidence; and (3) finding that Ross could perform past relevant work and, alternatively, that Ross could perform other work in the national economy where the vocational expert was not properly questioned about the impact of Ross's functional limitations or the appropriate vocational factors. Each of these arguments relate to the ALJ's finding at steps four and five with respect to Ross's RFC and the type of work he could perform with that RFC.

Ross contends that the ALJ's determination that Ross "had the residual functional capacity to perform a full range of work at all exertional levels and his ability to perform work at all

---

[3]Because the ALJ found that Ross could return to past relevant work, the ALJ did not directly address step five, reached only if the ALJ determines that a claimant's limitations prevent him from returning to his past relevant work. In his decision, however, the ALJ noted that the VE testified that Ross could perform alternative work "as an order clerk, information clerk, or bench assembler." R. 12.

exertional levels is not significantly compromised by any nonexertional limitations" (R. 11) was, at minimum, inconsistent with medical opinions in the record and, accordingly was not supported, as required, by substantial evidence. (Pl. Br. 9-12). "RFC is what an individual can still do despite his or her functional limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a *regular and continuing* basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR"), 96–8p, 1996 WL 374184 at *2 (Jul. 2, 1996) (citation omitted) (emphasis in original). Further, the "RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at *7.

### 1.    Medical Opinions About Mental Limitations

The ALJ failed to provide his reasons for rejecting the medical opinion of Dr. Uzogara - Ross's treating psychiatrist - and affording more weight to opinions of physicians who only examined Ross on one occasion. Throughout his treatment, Dr. Uzogara indicated that in addition to suffering from depression, Ross suffered from anxiety, had limited ability to understand and remember, decreased ability to concentrate and limited ability to interact with co-workers and supervisors. R. 314, 377, 380.

The ALJ must generally give controlling weight to a treating physician's opinion "since

these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the patient's medical condition. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, the ALJ is not required to "automatically accept [his or her] conclusion." Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998). The ALJ gives controlling weight to the opinion of the claimant's treating physician only if it "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2); see Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (citing Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)). If the ALJ does not give a treating physician's report controlling weight, he must consider six factors to determine what weight to give it:

> 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinions reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion.

Guyton, 20 F. Supp. 2d at 167 (citing 20 C.F.R. § 404.1527(d)(2)(6)). The regulations do "not mandate assignment of some unvarying weight to every report in every case." Guyton, 20 F. Supp. 2d at 167 (citation omitted). However, an ALJ must give "good reasons" for the weight given to a physician's opinions. 20 C.F.R. § 416.927(d)(2). Here, the ALJ failed not only to provide a "good" reason, but provided no reason at all for disregarding a portion of Dr. Uzogara's report while crediting another and choosing to rely on a different physician's assessment's of Ross's functional limitations.

"The ALJ, although empowered to make credibility determinations and to resolve conflicting

evidence . . . [is] not at liberty simply to ignore uncontroverted medical reports." <u>Suarez v. Sec'y of Health & Human Servs.</u>, 740 F.2d 1, 1 (1st Cir. 1984) (per curiam) (citations omitted); <u>Nguyen</u>, 172 F.3d at 35 (finding that the ALJ "is not at liberty to ignore medical evidence or substitute her own views for uncontroverted medical opinion"). "Where the ALJ fails to explicitly indicate the weight given to all relevant evidence, the reviewing court cannot affirm the Commissioner's decision." <u>Nguyen v. Callahan</u>, 997 F. Supp. 179, 182 (D. Mass. 1998) (internal quotation marks and citation omitted). Failing to address such evidence makes it "impossible [for a court] to determine whether he merely discredited that assessment or, in fact, overlooked that piece of [ ] evidence most supportive of [the claimant's] claim." <u>Id.</u> By "fail[ing] to record consideration of an important piece of evidence that supports [the claimant's] claim . . . thereby, [leaving] unresolved conflicts in the evidence, th[e] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision." <u>Id.</u> Such is the case here where the ALJ disregarded conflicting medical evidence, and appears to have afforded more weight to the opinions of other physicians than those of Ross's treating psychiatrist and was silent about his reasons for doing so.

Specifically, in reaching its conclusion that Ross had no mental limitations and could perform work at all exertional levels, the ALJ failed to address the conflicting medical opinions discussing Ross's limitations with respect to concentration, attention, memory, pace and interaction with others. For example, the questionnaire dated July 10, 2007 completed by Dr. Uzogara, Ross's treating psychiatrist, indicated that Ross suffered from "chronic relapsing depression" with limited memory for recent information, decreased concentration ability and limited ability to interact with co-workers and supervisors. R. 377-80. A mental RFC assessment conducted by Dr. Aberger several months later on October 26, 2007, indicated that Ross had depression resulting in

"deficiencies of concentration, persistence or face resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere)" and that Ross was "[m]oderately [l]imited" in his ability to "[u]nderstand, remember & carry out detailed instructions" and "work at a consistent pace." R. 372-73. Notwithstanding such limitations, Dr. Aberger stated that Ross was "capable of performing basic, unskilled work activity," that Ross's memory, attention and concentration were all adequate, R. 367, and that Ross was not limited in most other areas including, *inter alia*, the ability to "[u]nderstand, remember & carry out very short and simple instructions," "[m]aintain attention & concentration to sustain employment," "[i]nteract and cooperate appropriately with co-workers" and "ability to travel outside the home." R. 373.

However, in January 2008, Ross's treating psychiatrist, Dr. Uzogara again reported that Ross had a limited ability to concentrate/persist, limited ability to interact with co-workers and supervisors. Another psychologist's report in June 2008 indicated that Ross had decreased attention and recent memory and had "deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in working settings or elsewhere)." R. 299-300. The ALJ failed to point to the conflicting medical evidence on the record, much less provide his reasons for affording more weight to certain medical opinions than others. The ALJ stated only that Ross's depression was mild and that his GAF was consistently reported as 60.[4] R. 11-12. While this may be true, the ALJ disregarded the conflicting medical opinions characterizing Ross's functional limitations to varying degrees. Upon remand, the ALJ will make clear that he considered

---

[4]Although the record demonstrates that Ross's treating psychiatrist, Dr. Uzogara, reported Ross's GAF at 60 on several occasions, another physician, Dr. Lawson, determined in April 2008 that Ross's GAF was 50, (R. 322-23), indicating that Ross's functioning was below "moderate" functioning and that Ross had "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals . . . ) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

and addressed all medical opinions, including those of Dr. Uzogara.   See e.g., Nguyen, 997 F. Supp. at 183.

## 2.    Credibility of Ross's Statements and Subjective Complaints

Ross further argues that the ALJ did not provide a legally sufficient explanation for his finding that his testimony regarding his symptoms was not credible, as required by 20 C.F.R. § 404.1529(c) and SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996).  (Pl. Br. at 12-14).[5]  The  ALJ found that Ross's statements concerning "the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [ ] residual functional capacity assessment," (R. 11), but did not support this credibility determination with specific evidence with respect to either his mental or physical limitations.   As to Ross's mental limitations, the ALJ found that the record did not support the symptoms alleged and stated only that the record shows that Ross's depression was mild in severity and that Ross's GAF was consistently 60 over a prolonged period of time which is "representative of only moderate psychiatric symptoms or any moderate impairment in social, educational or occupational functioning."   R. 11.  With respect to Ross' physical limitations, the ALJ concluded that he had no limitations and that he is not limited in his ability to sit, stand or walk, relying on a physical examination the ALJ opined was "unremarkable"

_____

[5]As explained in SSR 96-7p: "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2.

citing to Exhibit 7F which includes Dr. Thakur's May 2008 or Dr. Lawson's April 2008 reports. R. 11.

To establish a claim of disability due to pain or other subjective symptoms, a plaintiff must first show that he has a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 21 (1st Cir. 1986). If so, the ALJ must then consider the intensity and persistence of the plaintiff's symptoms as well as the functional impact those symptoms may have on his ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); Makuch v. Halter, 170 F. Supp. 2d 117, 126 (D. Mass. 2001). In making this determination, the ALJ must consider all available evidence. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). However, a plaintiff's statements regarding the intensity and persistence of his pain and its impact on his ability to work will not be rejected solely because they are not substantiated by the available objective medical evidence. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

The regulations recognize that a person's symptoms may be more severe than the objective medical evidence suggests. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Therefore, several factors (known as the Avery factors) should be considered when an applicant alleges pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medications, received to relieve pain or other symptoms; (6) measures used by claimant to relieve pain or other symptoms; and (7) any other factors relating to claimant's functional limitations and restrictions due to pain. Avery, 797 F.2d at 28-29; see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

To complete the analysis, the ALJ often must assess the credibility of a plaintiff's statements about the intensity of her pain and other symptoms, as well as their effect on his functional abilities. SSR 96-7p, 1996 WL 374186, at *1, 2; see also 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Although the ALJ's credibility determination is generally entitled to deference, "an ALJ who does not believe a claimant's testimony regarding his pain, 'must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant].'" Makuch, 170 F. Supp. 2d at 126 (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)); see also SSR 96-7p, 1996 WL 374186, (requiring that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements" and "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record").

Here, Ross refers to his limits in stooping, bending, dizziness and fatigue arguing that the ALJ failed to give proper consideration to his subjective complaints. (Pl. Br. 12-14). The ALJ failed to address several Avery factors in explaining his decision to discredit Ross's claims as to the intensity and persistence of his pain. The ALJ failed to address the following Avery factors: the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the side effects of Ross's Doxepin; and other factors relating to Ross's functional limitations and restrictions due to pain. For example, the ALJ stated that Ross was being treated for his depression with psychotherapy and Doxepin, but did not address the alleged side effects Ross testified he experiences while taking Doxepin, namely dizziness and drowsiness. R. 12, 24, 279, 379. In addition, in finding Ross had no physical limitations, the ALJ stated that Ross's medical records show that he has no restrictions on his abilities to stand, walk or sit, (R. 12), relying on Dr.

Uzogara's January 2008 report noting the same. R. 315. However, in selectively citing to that report, the ALJ disregarded Dr. Uzogara's notation that Ross was limited in his ability to stoop, bend and lift. R. 315.[6] Such physical limitations noted in Ross's medical records affecting his daily activities, (R. 315, 317, 469), and to which he testified at the hearing, R. 19, would indeed affect a claimant's ability to perform not only his past work but work at all exertional levels. Yet, the ALJ explained neither the impact of Ross's dizziness or his limited ability to stoop or bend on his daily activities or address the side effects of his medication.

Although it is true as a general matter that "[t]he credibility determination by the ALJ, who observed the claimant, evaluated h[is] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference....", Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987), the ALJ "must make specific findings as to the relevant evidence he considered in determining to disbelieve the claimant." Da Rosa, 803 F.2d at 26 (citation omitted); see Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309-10 (D. Mass. 1998) (noting that when the ALJ decides to discredit a claimant's allegations, the ALJ must articulate specific and adequate reasons for doing so). Making such specific findings here regarding Ross's credibility was critical given the vocational expert's ("VE") testimony that if the ALJ credited Ross's testimony about his limited functional capacity and if the medical evidence substantiated the severity of the same, there would be no work he could do. R. 29.

### 3. Inquiry of Vocational Expert Regarding Functional Limitations

---

[6]Throughout 2008, Ross complained to physicians of intermittent pain in his knees. R. 449, 453, 457, 468. In a behavioral health assessment in late July 2008, Ross indicated that he spent most of his time in bed because it was the most comfortable place for him, given his pain and that "his bad knees prevent him from doing the housecleaning/janitorial work . . . he used to do." R. 469.

Since the ALJ found that Ross had no functional limitations, he proceeded to consider whether Ross retained the RFC to perform his past relevant work as a laundry attendant given his alleged limitations.  In making the determination that Ross could perform his past relevant work, the ALJ  relied on the testimony of the VE.  R. 12.  Ross argues that the ALJ erred when eliciting the VE's testimony and therefore erred in relying on it.  (Pl. Br. at 15-17).  The Court agrees that the ALJ erred in eliciting the VE's testimony without posing any hypothetical question addressing any mental and physical limitations, particularly in light of the ALJ's finding that Ross had moderate difficulties in concentration, persistence or pace.

"[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities."  Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  Here, the record shows that the ALJ asked the VE whether Ross could return to his past work if the medical evidence substantiated the severity of Ross's limited  functional capacity that he testified to having.[7]  The VE stated that there would be no work Ross could do "in particular the

---

[7]Q:    Would you classify his former work of 15 years?

  A:    Certainly.  Past relevant work as a laundry maintenance worker is a medium, unskilled occupation, DOT 361.684-014.

 Q:    Did he acquire transferable skills?

 A:    No, Your Honor.  It's an unskilled, unskilled past work, so there are no transferable skills.

 Q:    Please consider the profile that Mr. Ross brings today, and I want you to consider from a longitudinal standpoint both the exertional and non-exertional impairments that have been complained about.  If he has the limited functional capacity as he has testified to and if the medical evidence substantiated the severity of the same,

fatigue, the ability to get through . . . a day without side effect from either medication or chronic

pain." R. 29.  When the ALJ subsequently inquired whether Ross could do past work if the medical

evidence did not substantiate the severity of his complaints, the VE testified that he could do past

work if he is capable of medium work.[8]  Yet, the hypothetical questions posed to the VE did not

fully account for the mental and physical limitations found in the record.  Despite medical records

documenting Ross's functional limitations including his limited ability to bend, stoop, lift,

concentrate, remember,  and work at a consistent pace in addition to the dizziness caused by Ross's

medication and his complaints regarding the same, the ALJ concluded that Ross was able to return

to the physical and mental demands of being a laundry attendant which involves working at a

---

     could he obtain and sustain work on a regular basis?

  A:   No, Your Honor.  If the medical evidence supported the degree of impairment
      testified to, in particular the fatigue, the ability to get through, to get through a
      day without side effects from either medication or chronic pain, he could not
      sustain past work or any work on a regular basis.

  Q:   And if the medical evidence did not substantiate the severity of his complaints?

  A:   Well if he's capable of medium work, he could do past work.  If he, if he was
      limited to sedentary or light, he would have the full range of sedentary, light,
      unskilled.

  Q.   Such as?

  A:   Included in the, in the sedentary categories occupations would include order clerk
      . . . information clerk . . . bench assembler . . . Those would be representative
      types of sedentary and light, unskilled occupations.

  R. 29-30.


[8]The VE classified Ross's previous job as a laundry attendant as medium, unskilled work
with no transferable skills.  R. 29.  Under 20 C.F.R. § 404.1567(c), "[m]edium work involves
"lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up
to 25 pounds...."

consistent pace, bending, stooping, and non-exertional requirements. Accordingly, on remand, the ALJ's inquiry of the VE must include questions that fully account for the limitations supported by the record including the medical opinions.

**4.      Inquiry of the Vocational Expert Regarding Vocational Factors**

If a claimant meets his burden at step 4 to show that he is unable to perform past work to a significant limitation, the Commissioner has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can nonetheless perform with those limitations. <u>Arocho</u>, 670 F.2d at 375 (citations omitted). If the applicant's limitations are exclusively exertional, then the Commissioner can meet her burden by utilizing a chart found in the Medical-Vocational Guidelines contained in the Social Security regulations. 20 C.F.R. § 416.969; Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, App. 2, tables 1-3. The Medical-Vocational Guidelines, known as "The Grid," "consists of a matrix of the [claimant's] exertional capacity, age, education, and work experience." <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001). If the claimant's age, education and other characteristics fit within the Grid's categories, the Grid "directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Pt. 404, subpt. P, App. 2, § 200.00(a), cited in 20 C.F.R § 416.969. "[I]f the [claimant] has nonexertional limitations (such as mental . . . impairments....) that restrict his ability to perform jobs he would otherwise be capable of performing, then the Grid is only a 'framework to guide [the] decision.'" <u>Seavey</u>, 276 F.3d at 5 (quoting 20 C.F.R. § 416.969a(d)) (further citations omitted).

At step four, however, the ALJ determined - without providing a sufficient explanation for doing so - that Ross had no functional limitations, that he could perform work at all exertional levels and that he could therefore return to his previous job as a laundry attendant. In light of his

conclusion that Ross had no exertional or non-exertional limitations, the ALJ did not determine whether a finding of disability was mandated by the Grids.[9]

The VE testified that if Ross was limited to sedentary or light work, he would have the full range of light, sedentary and unskilled work.[10]  R. 30.    However, as Commissioner concedes, Ross's age and skill level, if accompanied by the capacity for only light or sedentary work, would mandate a finding of disabled under the Grids.  (Def. Br. at 18-19).  Pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00, "[t]he adversity of functional restrictions to sedentary work at advanced age (55 and over) for individuals with no relevant past work or who can no longer perform vocationally past work and have no transferable skills, warrants a finding of disabled."  Id. (d). Further, "[i]ndividuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work.  When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains."  Id. (g).  Ross is of either advanced age or approaching advanced age since he was 52 years old when he claims he became disabled in 2006, was 55 years old when the ALJ issued its decision in 2009 and is currently 57 years old.  His

---

[9]Ross argues that the ALJ was required to look to the Grids to determine whether Ross's exertional and non-exertional limitations, age, work experience and education warranted a finding of disabled.  (Pl. Br. 18-20).

[10]"Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties...."  20 C.F.R. § 404.1567(a).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities...."  Id. § 404.1567(b).

previous job as a laundry attendant, according to the VE's testimony, is an unskilled job with no transferable skills. R. 29. With respect to Ross's education, he graduated from high school but pursued no further education. R. 17. Thus, if Ross could only perform the full range of sedentary work, he would be considered disabled under Rules 201.12 or 201.04 of the Grids due to Ross's age, limited education and previous work experience. Under 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 202.00(a), "[t]he functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work." Id. If Ross could perform the full range of light work, he would be considered disabled under Rules 202.04, due to his age, limited education and previous work experience.

In eliciting the VE's testimony, however, the ALJ did not ask the VE to consider vocational factors including Ross's age, work experience or education in her assessment and did not ask which limitations would allow for light or sedentary work. Such an omission is significant since, as discussed above, the regulations provide that a person of advanced age, capable only of light or sedentary work with no relevant past work or who can no longer perform past relevant work, or has no transferability of skills, warrants a disabled finding. Accordingly, upon remand, the ALJ's inquiry of the VE should address the appropriate vocational factors.

## V.  Conclusion

Based on the foregoing, the Commissioner's motion to affirm is DENIED and Ross's motion to reverse or remand is DENIED in part and GRANTED in part. This case is REMANDED to the ALJ with instructions to, after any proceedings that may be suitable: (1) reassess Ross's RFC, and in doing so, fully address the medical opinions of record and Avery factors regarding the credibility of Ross's subjective complaints; (2) reassess, based upon such RFC determination, whether Ross

can return to past relevant work; and (3) complete the sequential evaluation process to determine if there is other work Ross could perform and in doing so, obtain and consider vocational expert testimony that addresses the proper hypothetical questions which include all of the limitations supported by the record and the appropriate vocational factors.

      **So ordered.**

/s/ Denise J. Casper     
United States District Judge